REVISED July 10, 2009

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

June 10, 2009

Charles R. Fulbruge III
Clerk

No. 07-20899

UNITED STATES OF AMERICA

Plaintiff-Appellee

V.

BARTHOLOMEW STEPHENS; STEVEN ANYANWU STEPHENS

Defendants-Appellants

Appeal from the United States District Court
for the Southern District of Texas

Before KING, STEWART, and SOUTHWICK, Circuit Judges.

CARL E. STEWART, Circuit Judge:

Brothers Bartholomew Stephens and Steven Stephens[1] were convicted of aggravated identity theft, aiding and abetting wire fraud, and conspiracy to commit identity theft and wire fraud. Each defendant challenges his convictions on several grounds. We AFFIRM.

---

[1] Because of their common last name, we refer to each defendant by his first name for the sake of clarity.

## BACKGROUND

The evidence presented by the Government at trial established that, in the wake of Hurricane Katrina, Steven registered a website: www.salvationarmyonline.org.  The website was patterned after the official Salvation Army website and claimed to be the website of the organization's international headquarters.  A donation link was created on the website, through which people could contribute money into PayPal accounts created in the names and identification numbers of individuals other than Steven or Bartholomew but linked to the brothers' bank accounts.  Donations were made, and the brothers profited.  Eventually, the FBI learned of the suspect Salvation Army site and obtained a search warrant for an apartment the brothers shared with another individual.  The FBI executed the warrant and recovered a trove of incriminating evidence regarding each defendant.

Steven and Bartholomew were indicted in July 2006 for conspiracy to commit wire fraud and aggravated identity theft (count one), aiding and abetting wire fraud (counts two through seven), and aggravated identity theft (counts eight and nine).  After a joint trial, the jury convicted both men on all counts.  The district court sentenced Steven to 111 months imprisonment, Bartholomew to 105 months imprisonment, and both defendants to pay a $900 assessment and three years supervised release.

## DISCUSSION

Sufficiency of the Evidence

1.

Bartholomew challenges the sufficiency of the evidence supporting the jury verdict convicting him on all counts of conspiracy, wire fraud, and aggravated identity theft.[2]  "It is by now well-settled that a defendant seeking reversal on

---

[2] Steven filed a motion to adopt all of his co-defendant's arguments pursuant to Federal Rule of Appellate Procedure 28(I).  "However, '[s]ufficiency of the evidence challenges are

the basis of insufficient evidence swims upstream." United States v. Mulderig, 120 F.3d 534, 546 (5th Cir. 1997). The standard of review is whether, after viewing all of the evidence and inferences that may be drawn therefrom in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. United States v. Holmes, 406 F.3d 337, 351 (5th Cir. 2005). However, if the evidence, viewed in the light most favorable to the verdict, points equally to a theory of innocence and guilt, we will reverse a conviction based on circumstantial evidence. Id.

2.

To convict Bartholomew of the conspiracy charge under 18 U.S.C. § 371, the Government was required to prove three elements beyond a reasonable doubt: (1) an agreement between Bartholomew and one or more persons (2) to commit the crimes of wire fraud and aggravated identity theft, and (3) an overt act by one of the conspirators in furtherance of that agreement. United States v. Ingles, 445 F.3d 830, 838 (5th Cir. 2006). The Government must also demonstrate that Bartholomew acted with the intent to defraud. Id. (citing United States v. Garza, 429 F.3d 165, 168-69 (5th Cir. 2005)). The Government is not required to provide direct evidence of the conspiracy. Holmes, 406 F.3d at 351. Associating with criminal conspirators is insufficient, but circumstantial evidence is enough to prove an agreement, and minor participation may support conviction. United State v. Bieganowski, 313 F.3d 264, 276 (5th Cir. 2002). "An agreement may be inferred from concert of action, voluntary participation may be inferred from a collection of circumstances, and knowledge may be inferred from surrounding circumstances." Id. (internal quotation marks and citations omitted).

---

fact-specific, so we will not allow the appellants to adopt those arguments.'" United States v. Solis, 299 F.3d 420, 444 n.70 (5th Cir. 2002). Therefore we consider only Bartholomew's challenge to the sufficiency of the evidence supporting conviction.

Bartholomew's conviction for aiding and abetting wire fraud in violation of 18 U.S.C. §§ 2 and 1343 required the Government to "prove (1) a scheme or artifice to defraud and (2) the use of wire communications in furtherance of the fraudulent scheme." United States v. Rajwani, 476 F.3d 243, 247 (5th Cir. 2007), modified on other grounds, 479 F.3d 904 (5th Cir. 2007). To prove a scheme to defraud, the Government must show fraudulent activity and that the defendant had a conscious, knowing intent to defraud. Id.

Finally, to convict Bartholomew of aggravated identity theft, the Government was required to prove that Bartholomew (1) knowingly used (2) the "means of identification" of another person (3) without lawful authority (4) during and in relation to a violation of wire fraud. § 1028A(a)(1). The phrase "means of identification" includes another person's name or social security number. Id.; § 1028(d)(7)(A). Recently in Flores-Figueroa v. United States, the Supreme Court concluded that § 1028A(a)(1) requires the Government to prove that the defendant "knew that the 'means of identification' he or she unlawfully transferred, possessed, or used, in fact, belonged to 'another person.'" 129 S. Ct. 1886, 1888 (2009) (emphasis in the original).

3.

The evidence established that the domain www.salvationarmyonline.org was registered using Steven's name, e-mail address, mailing address, and credit card information. The registration form filled out and submitted to register the domain name indicated that Steven was associated with the Salvation Army when, in fact, he was not. PayPal accounts, registered to various email addresses, were linked to the bogus Salvation Army website, received donations through the website, and deposited into bank accounts owned by both Steven and Bartholomew, although created using the names and identification numbers of individuals other than Steven or Bartholomew. Two of the PayPal accounts were linked to a bank account held solely by Bartholomew, while one of the

PayPal accounts was linked to a bank account held jointly by Bartholomew and Steven.[3] Steven and Bartholomew's joint bank account also received deposits from the fraudulent PayPal accounts. The brothers made multiple withdrawals from their joint bank account and transferred $10,912.00 to another bank account held jointly by the brothers.

Approximately one month after the bogus Salvation Army website was registered, the domain www.redcross-usa.org, purporting to be part of the Red Cross, was registered using the name Beis Stephens, as well as Bartholomew's e-mail address, mailing address, and credit card information. A laptop recovered from the brothers' apartment contained a picture of Bartholomew wearing a shirt that read "BEIS LETHAL INC." This laptop also contained the www.salvationarmyonline.org web page and search results for the Salvation Army that listed www.salvationarmyonline.org as the first "hit." One of these searches appeared in a subfolder entitled "BJ Stephens."

Another computer recovered from the apartment contained a spreadsheet entitled "Mock Money Makin.doc" that tracked the e-mail addresses linked to the PayPal accounts and indicated the name and bank account associated with each e-mail address, as well as the amount of money deposited in each bank account.[4] A desktop computer also recovered from the apartment contained a document in a folder labeled "Tex," shown to be Steven's nickname,[5] entitled "Socials.doc."

---

[3] Three other PayPal accounts were linked to a bank account held solely by Steven.

[4] The spreadsheet also contained statements about www.redcross-usa.org: "redcross-usa.org is currently available! Do everything from the school[.] Create yahoo e-mail, try these in this order: 1. americanredcross@yahoo.com    2. redcrossusa@yahoo.com 3. redcross-usa@yahoo.com  4. redcrossdonations @yahoo.com    5. redcrossdonation1@yahoo.com 6. redcross_donations@yahoo. com   7. Redcross_donation1@yahoo.com."

[5] The jury learned that several items in the apartment suggested that Steven goes by the nickname "Tex." The FBI seized a notepad that contained the moniker Tex, business cards with Steven's picture and the words "Sir Tex-CEO" printed on them, and a graduation announcement addressed to "Steven 'Tex' Stephens."

This "Socials.doc," which appeared to be a letter to PayPal about one of the accounts, also listed other individuals' names, social security numbers, and dates of birth. The desktop contained other documents related to the scheme, including a list of purported directors of the Salvation Army, temporary files containing the graphic logos of both the Salvation Army and the Red Cross, and a Google AdWords review of an account with the keywords "salvation army donation" and "hurricane relief."

In addition to the above evidence, the police also recovered an email from Steven to Bartholomew that listed several names, addresses, and social security numbers that had been given to PayPal. The email stated that Steven had "Created a Bank Account for these people already." Some, but not all, of the social security numbers included the notation "fake social." The jury could reasonably infer that social security numbers not so denoted were real – and thus other individuals' – social security numbers.

The jury was also presented with numerous hard copy documents containing incriminating evidence that were found in the apartment. Some examples include correspondence with PayPal, handwritten notes about being listed on search engines, documents aimed at gaining tax-exempt status, photocopies of an altered driver's license, Bartholomew's resume (showing that he was proficient with computers and interested in computer technology), and a bank statement for the brothers' joint account reflecting $21,747.00 in transfers from the PayPal accounts. The brothers' bank statement had the name of one of the identity theft victims superimposed over the true holders' names.

The evidence presented to the jury is more than sufficient to support the existence of a conspiracy between Bartholomew and Steven, as well as Bartholomew's conviction for wire fraud and identity theft. Certainly the circumstantial evidence presented was sufficient for a reasonable jury to have found that Bartholomew entered into a conspiracy with Steven, performed overt

acts in furtherance of the conspiracy, and had knowledge of the unlawful objectives of the conspiracy. A variety of evidence connects Bartholomew to the fraudulent Salvation Army website and supports his conviction on the wire fraud and conspiracy counts, including e-mails between the brothers about the scheme, money deposited into Bartholomew's bank accounts from the PayPal accounts receiving donations from the Salvation Army website, and a document that lists Bartholomew as the Technology Account Director for the Salvation Army Online company.[6] Finally, in regards to identity theft, the evidence demonstrates that PayPal accounts were created in the names and identification numbers of individuals other than Bartholomew and that those PayPal accounts were used to perpetuate wire fraud. Bartholomew's email exchange with Steven regarding "fake socials," as well as the documents found on computers in the apartment which tracked the names associated with the PayPal accounts and the amount of money in each account, is ample evidence on which the jury could reasonably conclude that Bartholomew committed aggravated identity theft.[7]

Although Bartholomew maintains that there was no direct evidence of his knowledge or intent as to any of the charges – specifically, that there was no evidence that he was not simply another identity theft victim of the scheme – the Government was not required to present direct evidence. Bartholomew contends

---

[6] Steven emailed Bartholomew with an attached letter from Bartholomew to PayPal. The letter indicated that Bartholomew was the Technology Account Director for the Salvation Army Online company and requested that PayPal update an account to show that Bartholomew was the new administrator. The letter also stated that it was important for PayPal to do this in a timely fashion due to the Salvation Army's effort in collecting funds for those in "dire need" of relief efforts.

[7] In addition, the jury received the co-conspirator's liability charge. If the jury found Bartholomew guilty of the conspiracy charge, and Steven guilty of any of the substantive counts, it could find Bartholomew guilty of those counts so long as Steven's acts were reasonably forseeable, even if Bartholomew did not participate in any of the acts constituting that substantive offense. See United States v. Jimenez, 509 F.3d 682, 692 & n.9 (5th Cir. 2007) (quoting Pinkerton v. United States, 328 U.S. 640 (1946)).

that his bank account was probably used as a means of implicating him in the case and not because he was actually involved in the crimes charged. Such speculation is insufficient, however, since this court views all evidence in the light most favorable to the verdict, including all reasonable inferences. "The evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, and the jury is free to choose among reasonable constructions of the evidence." United States v. Lopez, 74 F.3d 575, 577 (5th Cir. 1996). "The jury was entitled to conclude that the totality of the evidence belied the defense theory" that Bartholomew was a victim of identity theft and uninvolved in the conspiracy or substantive crimes. See Rajwani, 476 F.3d at 247.

Because there was ample evidence that would allow the jury to find beyond a reasonable doubt that the elements of each count were satisfied, we affirm Bartholomew's convictions.

## Prosecutorial misconduct

Steven and Bartholomew assert that the Government made improper comments during both the Government's opening statement and during Steven's closing argument constituting prosecutorial misconduct.

1.

We first examine the Government's objection during Steven's closing argument, which the brothers allege to have been an improper comment on their decision not to call witnesses, by stating that both sides could subpoena witnesses.[8] Because the comment was timely objected to, it is reviewed under

---

[8] The exchange during Steven's closing argument was as follows:

Defense counsel: The guns. I suggested to you yesterday that they could have been bought on-line. And who could they have been bought by? Daniel Lee Garrett. We don't know much about him. We know very little about him. The Government could have brought him into court. The Government could have subpoenaed him. They could have found him. They could have brought you this

an abuse of discretion standard.  United States v. Gracia, 522 F.3d 597, 600 n.2 (5th Cir. 2008).

"Improper prosecutorial comments constitute reversible error only where the defendant's right to a fair trial is substantially affected."  United States v. Holmes, 406 F.3d 337, 355-56 (5th Cir. 2005) (quotations omitted).  This court applies a two-step inquiry in analyzing claims of prosecutorial misconduct.  "First, we assess whether 'the prosecutor made an improper remark.'  If so, then we ask whether the defendant was prejudiced."  United States v. Fields, 483 F.3d 313, 358 (5th Cir. 2007) (citation omitted).

We do not find the Government's objection to constitute reversible error.  This exchange is similar to one that we examined in Palmer.  See id. at 1086.  In Palmer, the prosecutor requested, prior to trial, that the district court forbid the defense from referencing witnesses who were not going to testify.  In response, the district court ruled that "if the defense says the government did not subpoena the witnesses, then the government can say that the defense did not subpoena them."  Id.  During closing argument, defense counsel twice referred to unsubpoenaed witnesses, and in rebuttal the prosecutor stated that "defense counsel has the exact same subpoena power that the government has[,]" and "[the defendant] could have subpoenaed [the extra witnesses] if he wanted you to hear their stories."  Id.  This court found no error in the prosecutor's

---

missing witness.  We know very little about him.

Government: I'm going to object, Your Honor.

The Court: What's your objection?

Government: Both sides could have done that with subpoenas.

Defense counsel: Of course both sides could have done it.  But the point is it's the Government's burden to prove its case, and Mr. Costa knows that.

The Court: Okay.  Go on.  Continue.

9

statement because "[r]ather than an impermissible shift in the burden of proof, these comments were a response to defense counsel's argument." Id. Similarly, we find that the Government's objection was a response to Steven's closing argument and was not an attempt to shift the burden of proof.

Furthermore, as a result of the Government's objection and after Steven's motion for a mistrial, the trial court gave the jury a curative instruction to remind them that the burden of proof was "beyond a reasonable doubt," that it at all times remained on the Government, and that the defendants were not required to put on any proof.[9] Even assuming arguendo that the statement was error we find that, in light of the curative instruction given to the jury and the ample evidence produced at trial, it was not sufficiently prejudicial to warrant reversal of either defendant's conviction.

2.

Both defendants also challenge the Government's reference to Hurricane Katrina during its opening statement to the jury. Because there was no timely objection, the "already narrow standard of review [of alleged prosecutorial misconduct] is further constrained," and the defendants "bear[ ] the burden of demonstrating that the prosecutor's statements constitute plain error." Holmes, 406 F.3d at 355-56. To establish reversible plain error, each defendant must show that "(1) there is error[,] (2) it is plain[,] and (3) it affected his substantial rights." Gracia, 522 F.3d at 600. Even where that burden is met, we still retain

---

[9] Specifically, after closing arguments and the jury retired to start deliberations, the district court called the jurors back and stated:

> Ladies and gentlemen, just out of an abundance of caution, I want to mention to you again that the burden of proof in a criminal case is on the government and they are required to prove each element beyond a reasonable doubt.
>
> The Defendant has no burden or requirement or any kind of a – what is it? – requirement of them to prove anything. They can just stand moot [sic]. And that burden never shifts. It stays on the Government.

discretion to decide whether to reverse the conviction, "which we generally will not do unless the plain error seriously affected the fairness, integrity, or public reputation of the judicial proceeding." Id.

Near the start of its opening statement, the Government reminded the jurors of the images of victims stranded in New Orleans and the generosity many Houston residents showed in the wake of that event. The Government then described the brothers as "decid[ing] to take advantage of that generosity that people in Houston and all over the country showed in trying to help Hurricane Katrina victims."[10] However, this was not clearly an out-of-bounds appeal to emotion, as the scheme charged involved efforts to defraud people into making what they believed to be charitable donations to aid hurricane relief, and a review of the entire opening statement shows that it was not designed to unfairly prejudice the defendants. In addition, during its charge to the jury, the court reminded the jurors that it was part of their duty "to base [their] verdict solely upon the testimony and evidence in the case, without prejudice or sympathy, including for the victims of the Hurricanes Katrina and Rita." Considering the context of the Government's statement, the court's instruction to the jury, and the strength of evidence supporting the convictions, we find no plain error in the Government's statement.

Admission of Evidence Under Rule 404(b)

Steven and Bartholomew assert that the district court erred under Federal Rule of Evidence 404(b) when it admitted evidence of the Red Cross website registered by Bartholomew. Generally, challenges to the admission of evidence

---

[10] Steven also challenges the Government's reference to Hurricane Katrina during its closing argument. The prosecutor argued to the jurors that, viewing all of the evidence together, "you're not going to have any doubt that Bartholomew and Steven Stephens in the – just a few days after Hurricane Katrina decided to launch a scheme to run a website that claimed it was a Salvation Army website accepting donations to help hurricane victims." We reject this contention for the same reasons reference to the hurricane during opening arguments does not require reversal.

at trial are reviewed by this court for an abuse of discretion, "subject to harmless error analysis." United States v. Crawley, 533 F.3d 349, 353 (5th Cir. 2008). However, because neither defendant made a timely objection at trial to preserve the issue, we also review this issue for plain error.[11] See United States v. Duffaut, 314 F.3d 203, 209 (5th Cir. 2002).

Relevant evidence "is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, by [the Federal Rules of Evidence], or by other rules prescribed by the Supreme Court pursuant to statutory authority." FED. R. EVID. 402. Rule 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of the person in order to show action in conformity therewith." FED. R. EVID. 404(b). However, such evidence may be still admissible for "other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Id. The purpose of Rule 404(b) is to "guard against the inherent danger that the admission of 'other acts' evidence might lead a jury to convict a defendant not of the charged offense, but instead of an extrinsic offense." United States v. Sumlin, 489 F.3d 683, 689 (5th Cir. 2007).

The Government asserts that the district court did not err in admitting evidence regarding the Red Cross website because it was intrinsic to the charged crimes. Rule 404(b) is not implicated if the Red Cross evidence was intrinsic to the acts for which the brothers were charged, i.e. the fraudulent Salvation Army website.[12] United States v. Williams, 900 F.2d 823, 825-26 (5th Cir. 1990). We

---

[11] Both brothers filed motions in limine to exclude evidence of the Red Cross website, which were overruled, but neither renewed the objection at trial. See United States v. Estes, 994 F.2d 147, 149 (5th Cir. 1993) ("A party whose motion in limine is overruled must renew his objection when the evidence is about to be introduced at trial." (citation and quotation marks omitted)).

[12] This approach has been highly criticized by some courts. See, e.g., United States v. Bowie, 232 F.3d 923, 927 (D.C. Cir. 2000) ("As a practical matter, it is hard to see what function this interpretation of Rule 404(b) performs. If the so-called 'intrinsic' act is indeed

find "other act" evidence to be intrinsic to the charged crime "when the evidence of the other act and the evidence of the crime charged are 'inextricably intertwined' or both acts are part of a 'single criminal episode' or the other acts were 'necessary preliminaries' to the crime charged." Williams, 900 F.2d at 825. Intrinsic evidence "is admissible so that the jury may evaluate all the circumstances under which the defendant acted." United States v. Hawley, 516 F.3d 264, 267 (5th Cir. 2008) (quotation omitted). The government argues that the Red Cross website was intrinsic to the Salvation Army website conspiracy because it more clearly established the connection between Steven and Bartholomew and was inextricably intertwined with the evidence of both of the substantive offenses.[13]

However, we conclude that the Red Cross website evidence is not intrinsic to the Salvation Army scheme. The action of creating the Red Cross website was not "inextricably intertwined" with the evidence of the Salvation Army website. Neither was it a part of a single criminal episode or a necessary preliminary step in the Salvation Army website scheme. Certainly the actions are similar, but they were still distinct events. See United States v. Nguyen, 504 F.3d 561, 574 (5th Cir. 2007) ("Though the conspirators used the same scheme at all of the properties, each [real estate] deal was a distinct and distinguishable event."); Williams, 900 F.2d at 825-26 ("The various mailings [of packages of drugs] were distinct and distinguishable events none of which constituted a necessary preliminary for another."); also United States v. Freeman, 434 F.3d 369, 374 (5th Cir. 2005) (evidence of second, unindicted wire fraud Ponzi scheme was intrinsic

---

part of the crime charged, evidence of it will, by definition, always satisfy Rule 404(b). . . . So far as we can tell, the only consequences of labeling evidence 'intrinsic' are to relieve the prosecution of Rule 404(b)'s notice requirement and the court of its obligation to give an appropriate limiting instruction upon defense counsel's request.").

[13] There was no evidence introduced, however, that the Red Cross website was indeed fraudulent or that any donations were ever collected from the website.

where funds gained from both schemes were co-mingled and funds from second scheme were used to make "lulling payments" in charged scheme).

When this court finds "other acts" evidence to be extrinsic, we apply the two-step test outlined in United States v. Beechum, 582 F.2d 898, 911 (5th Cir. 1978) (en banc). "First, it must be determined that the extrinsic offense evidence is relevant to an issue other than the defendant's character. Second, the evidence must possess probative value that is not substantially outweighed by its undue prejudice and must meet the other requirements of [R]ule 403." Id. Even under this stricter standard of relevance, we cannot conclude that the district court plainly erred as to either defendant in admitting the evidence.[14]

With respect to step one, the Government maintains that the registration of the Red Cross website was relevant to the brothers' plan, intent, motive, and preparation. This court has stated that whether evidence is relevant to the issue of intent "is determined by comparing the defendant's state of mind in perpetrating the respective offenses." Crawley, 533 F.3d at 354. It has also been stated that "there is no requirement that the [extrinsic evidence] result[] in formal charges." Id. Although both brothers contest that the Red Cross evidence was relevant because the Government did not put on proof that it was not a legitimate Red Cross website, we disagree. In Nguyen, this court explained that extrinsic evidence of using the same scheme repeatedly is relevant to knowledge and intent, in that it "demonstrate[s] how [an] operation work[s]." 504 F.3d at 574. Such was the case with Bartholomew's registration of the Red Cross website. For example, the "Mock Money Makin.doc" spreadsheet, recovered from one of the computers in the brothers' apartment, contained

---

[14] The district court is not required to conduct an on-the-record Beechum analysis unless the defendant requests one. Nguyen, 504 F.3d at 574. Although the district court did not expressly determine whether evidence of Bartholomew's registration of the Red Cross website was intrinsic or extrinsic, it conducted an implicit Beechum analysis during the hearing on the motion in limine after which it concluded evidence of the website was admissible.

information about the PayPal accounts linked to the Salvation Army website, as well as information about creating a PayPal account for the Red Cross website and about listing the Red Cross website on a search engine called Overture. This spreadsheet demonstrated, at least in part, how the operation worked and therefore helped establish the brothers' intent, planning, preparation, and knowledge.

With respect to step two, neither defendant has demonstrated how the probative value of the evidence was substantially outweighed by the danger of undue prejudice to such a degree that for the district court to have admitted the evidence was plain error.  There was ample non-Red Cross evidence supporting the jury's verdict.  Though the defendants emphasize the number of references made to the Red Cross website by the Government, this does nothing to undermine the overwhelming evidence that exists regarding the Salvation Army web site scheme, nor the fact that the jury was instructed to use the extrinsic evidence to ascertain the brothers' mental state.  See, e.g., Williams, 900 F.2d at 827 ("As long as it is clear to the jury that the extrinsic evidence of the [other act] is presented only to show modus operandi to prove knowledge and intent, there is little danger that presentation of the extrinsic evidence will cause unfair prejudice . . . .").  Furthermore, even assuming that the district court erred in admitting the evidence of the Red Cross website, neither defendant has demonstrated that such evidence affected his substantial rights. We cannot conclude that the district court committed plain error when it admitted evidence regarding the Red Cross website.

Cumulative Error

Finally, Bartholomew contends that cumulative error led to an erroneous jury verdict.   This argument essentially summarizes the other issues raised on

appeal.[15]  Under the cumulative error doctrine, relief may be obtained "only when constitutional errors so 'fatally infect the trial' that they violate the trial's 'fundamental fairness.'" United States v. Bell, 367 F.3d 452, 471 (5th Cir. 2004) (citation omitted).  Because we have determined that the district court did not err, Bartholomew's argument fails.

CONCLUSION

For the foregoing reasons, we AFFIRM the convictions.

---

[15] In addition to the issues addressed above, Bartholomew argues that there was a variance between the indictment and the evidence introduced at trial.  He asserts "the indictment required proof of a scheme pertaining to the web site www.thesalvationarmyonline.org, [but] the proof at trial pertained to the website www.salvationarmyonline.org."  In fact, the indictment does allege the establishment of www.salvationarmyonline.org.  No variance exists.